UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

Dariusz Dziadkiewicz and Carl G. Durden, on behalf of themselves, persons claiming under their health plans, and all persons similarly situated,

Plaintiffs,

vs.

Blue Cross & Blue Shield of Rhode Island,

Defendant.

C.A. NO. 96-275S

STATE OF RHODE ISLAND

PROVIDENCE, S.C.

SUPERIOR COURT

Kerrigan Hanoian, Joseph Triangolo, and Terrence J. Kane, on behalf of themselves, persons claiming under their health plans, and all persons similarly situated,

Plaintiffs,

v.

Blue Cross & Blue Shield of Rhode Island,

Defendant.

CASE NO. 96-2579

# APPLICATION AND MEMORANDUM IN SUPPORT OF APPLICATION FOR AWARD OF ATTORNEYS' FEES, EXPENSES AND CLASS REPRESENTATIVE AWARDS

## Application

Pursuant to the Stipulation of Settlement herein, and in accordance with the Order of Preliminary Approval issued by both Courts dated March 23, 2005, class counsel, on behalf of themselves and the class representatives, respectfully petition the Courts for an award of attorneys' fees, reimbursement of expenses, and class representative awards as follows:

a. Class counsel respectfully ask the Courts, consistent with the terms of the Stipulation of Settlement, to award attorneys' fees in the amount of $5.67 million, representing 33 1/3% of a portion of the common fund[1] created by the settlement. This application covers all pre- and post-settlement services of class counsel both past and future, with a minor exception relating to toll-free line monitoring.[2]

b. Class counsel respectfully request reimbursement out-of-pocket expenses of $421,306. Subsequent post-award expenses will be paid from the settlement fund, as have some pre-award expenses.[3]

c. Class counsel respectfully seek awards of $25,000 each for plaintiffs Dariusz Dziadkiewicz, Carl G. Durden, Kerrigan Hanoian, Joseph Triangolo and Terrence J. Kane, representing compensation for both their initiative and their time. Class counsel further seeks awards of $10,000 each for the following former plaintiffs and deponents: Paul and Marjorie Caranci (one award), Roseanne Ehrenberg, and Karen Tancredi.

---

[1] The amount requested is 33 1/3% of $17 million. The total settlement amount is $17.5 million. Counsel further estimates interest on the settlement fund will total $200,000. **Foster Aff., ¶8**. Class counsel deems it inappropriate to seek a percentage of the last $500,000 of the settlement, because that amount was essentially earmarked by the parties to represent Blue Cross' contribution to post-settlement administrative costs. As noted in the accompanying **Affidavit of Wood R. Foster, Jr. ("Foster Aff."), ¶11**, class counsel presently believes that total past costs plus total future costs of administration will not exceed (or will only slightly exceed) $700,000.

[2] Paragraph 2.4.1 of the court-approved Plan of Distribution provides:

> With respect to the toll-free line, vendor costs, together with costs incurred for the time of one or more legal assistants to monitor the toll-free line, to research and document address change information, and/or to comply with Internal Revenue Service reporting requirements, may be reimbursed (at a rate not to exceed $95 per hour) from the Settlement Fund. Time expended by Class Counsel in supervising the legal assistant(s) (and other aspects of settlement administration) will not be separately compensated, but will be deemed included in any fee award approved by the Courts.

Class counsel estimates that the costs and hourly fees associated with the toll-free line will not exceed $25,000. **Foster Aff., ¶12**.

[3] See **Foster Aff., ¶9**.

# Argument

## A. A One-Third Fee Award Is Fair And Reasonable Under The Unique Circumstances Of This Settlement

### *1. A percentage-of-recovery award is appropriate*

In a seminal 1995 decision,[4] the First Circuit Court of Appeals adopted the "malleable" approach that allows courts to exercise their own discretion as to whether to use the "lodestar" or the "percentage-of-the-fund" (POF) method of determining fees in class actions.

At the same time, the First Circuit expressed a distinct preference for the "percentage of the fund" approach in complex litigation:

> In complex litigation – and common fund cases, by and large, tend to be complex – the POF approach is often less burdensome to administer than the lodestar method. [Citation omitted] Rather than forcing the judge to review the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended, the POF method permits the judge to focus on "a showing that the fund conferring a benefit on the class resulted from" the lawyers' efforts. [Citation omitted.] While the time logged is still relevant to the court's inquiry – even under the POF method, time records tend to illuminate the attorneys' role in the creation of the fund, and, thus, inform the court's inquiry into the reasonableness of a particular percentage – the shift in focus lessens the possibility of collateral disputes that might transform the fee proceeding into a second major litigation.
>
> For another thing, using the POF method in a common fund case enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency.[5]

Most circuits have adopted the same rule, or a close variation of it. As the Third Circuit has said:

> The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund "in a

---

[4] Thirteen Appeals Arising Out Of The San Juan Dupont Plaza Hotel Fire Litigation, 56 F.3d 295, 307 (1st Cir. 1995).
[5] Id.

manner that rewards counsel for success and penalizes it for failure" by aligning counsel's interests with those of the class.[6]

The Eighth Circuit has endorsed the percentage-of-recovery method for the very reasons described in the Third Circuit cases cited above.

> We have approved the percentage-of-recovery methodology to evaluate attorneys' fees in a common-fund settlement such as this. See Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir. 1999), and we find no abuse of discretion in the district court's awarding 36% to class counsel who obtained significant monetary relief on behalf of the class ....[7]

*Petrovic* in turn, had itself relied on the Report of the Third Circuit Task Force cited in *Cendant Prides.*[8] As can be seen from the multitude of cases cited elsewhere in this Memorandum, the Third Circuit has become the focal point of legal analysis on fees in class actions.

While pure lodestar fee analysis is still used in some courts and a few circuits, the strong trend in common fund litigation clearly supports the percentage-of-recovery method. Straightforward economic considerations appear to underlie the strong move toward percentage recoveries. Thus, "[t]he percentage method is widely used in the marketplace in contingent fee agreements and better reflects what a client, at the outset of the litigation, is willing to pay."[9]

---

[6] In Re Cendant Corp. Prides Litig., 243 F.3d 722, 732 (3d Cir. 2001), *citing* COURT AWARDED ATTORNEYS' FEES, Report of the Third Circuit Task Force, 108 F.R.D. 237, 241 (1985). *See also*, In Re GM Trucks, 55 F.3d 768, 819, n.38 (3d Cir. 1995) ("the percentage-of-recovery method resembles a contingent fee in that it awards counsel a variable percentage of the amount recovered for the class").

[7] In Re US Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir. 2002).

[8] *Petrovic*, 200 F.3d 1140 at 1157.

[9] Steiner v. Hercules, Inc., 835 F. Supp. 771, 792 (D. Del. 1993).

Similarly, "... the sharper focus on the common fund mandated by a percentage approach is appropriate because 'a common fund is itself the measure of success.'"[10]

The First Circuit also highlighted the value of a market-oriented approach in its scholarly opinion in *Thirteen Appeals*:

> Another point is worth making: Because the POF technique is result-oriented rather than process-oriented, it better approximates the workings of the marketplace. We think that Judge Posner captured the essence of this point when he wrote that "the market in fact pays not for the individual hours, but for the ensemble of services rendered in a case of this character." *In Re: Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). In fine, the market pays for the result achieved.[11]

A similar rationale for the percentage approach was recently suggested by a Minnesota district court which pointed out that "... [this approach] is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner."[12]

### 2. *The proposed fee is reasonable*

Even if a percentage-of-recovery method is used, the Court must still comply with the Supreme Court's basic standard for evaluating fee awards, i.e., the traditional standard of reasonableness.[13] While standards of reasonableness might differ slightly from circuit to circuit, there is no reason to suppose that the following considerations identified in the *Manual for*

---

[10] In Re Unisys Retiree Med. Bene. ERISA Lit., 886 F. Supp. 445 (E.D. Pa. 1995), *citing* Herbert P. Newberg, NEWBERG ON CLASS ACTIONS, §14.03 at 186 (1985). The Pennsylvania court in *Unisys*, also notes that "[t]oday the rationale has been fortified by an economic analogy to contingent fee litigation – the market reflects the fact that plaintiffs will pay a percentage of their recovery in turn for the work of attorneys in obtaining a result." *Unisys, supra, citing* Jerold Solovy, et al., ATTORNEYS' FEES IN COMMON FUND CASES: THE PERCENTAGE METHOD IS BACK IN SECURITIES CLASS ACTIONS: ABUSES AND REMEDIES 145 (Edward J. Yodowitz, et al., eds., 1994).

[11] *Thirteen Appeals,* 56 F.3d at 307.

[12] In Re Excel Energy, Inc. Securities Derivative & "ERISA" Litig., 364 F. Supp.2d 980, 992 (D. Minn. 2005), citing Lachance v. Harrington, 965 F. Supp. 630, 647 (E. D. Pa. 1997). See also, 1 Alba Conte, ATTORNEY FEE AWARDS, §1.08, at 15, 2nd Ed. 1993.

[13] Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

*Complex Litigation* fall very wide of the methodology that might be expected from any court carefully considering a percentage fee award:

a. The size of the fund and the number of persons who actually receive monetary benefits;

b. Any substantial objections to the settlement terms or fees requested by counsel for the class by class members (it is, however, a court's duty to scrutinize applications for fees, independently of any objection);

c. The skill and efficiency of the attorneys;

d. The complexity and duration of the litigation;

e. The risks of non-recovery and non-payment;

f. The amount of time reasonably devoted to the case by counsel; and

g. Awards in similar cases.[14]

Measured by these factors, class counsel's request for an award of one-third of the common fund created by the non-administrative portion of the settlement is reasonable on every count. Each consideration is examined separately.

**First Consideration: The Size of the Fund and the Number of Persons Who Actually Receive Monetary Benefits**

In terms of direct benefits, approximately 116,000 present and former Rhode Island Blue Cross subscribers will receive cash benefits averaging $93 per person, with a minimum payment of $10. Some will receive over $1,000.

Over 60,000 of these beneficiaries will receive a total of nearly $7 million in "Category 1" distributions *that represent a 100% recovery of all alleged damages exceeding $25 for most*

---

[14] MANUAL FOR COMPLEX LITIGATION FOURTH, 2005, §14.121, "Percentage-Fee Awards." Two additional factors have been omitted from the list because they seem irrelevant for the present analysis:

- Any understandings reached with counsel at the time of appointment concerning the amount or rate for calculating fees; any budget set for the litigation; or other terms proposed by counsel or ordered by the court;
- Any agreements or understandings, including side agreements, including attorneys and their clients or other counsel involved in the litigation;

*of the alleged wrongdoing during the years 1990-1993.* In other words, tens of thousands of class members are being "made whole" on certain claims *without reduction for attorneys' fees.* This is an unusual – even exceptional – result.

To be sure, other directly benefited class members are receiving distributions that reflect a discount and pro ration relative to actual alleged damages. But theirs is merely the "typical" result in a class action settlement. It is a compromise result.

Not to be forgotten in this case, however, are the *indirect* benefits that have flowed to virtually all Rhode Island Blue Cross Blue Shield subscribers. When this case began in mid-1996:

- Blue Cross subscribers who required services involving 20% copay had been paying more (sometimes *much* more) than 20% of the real cost of the services.

- SCRIP subscribers were paying a copay that was supposed to be "20% of Our Allowance," but that in fact bore no relation to the manner in which pharmacies were reimbursed by Blue Cross;

- Classic Blue subscribers were regularly subjected to "balance billing" (the difference between full price and the price offered by participating providers) for "participating" doctors to whom they went for "Major Medical" services, including office visits, contrary (plaintiffs argue) to both policy language and the clear message given in "Participating Provider Directories."

Blue Cross has changed all of these practices. The savings and convenience to Blue Cross subscribers cannot be measured monetarily, but plaintiffs believe it is fair to assert that, in all likelihood, there was at least *some* connection between the lawsuits and the phase-out of the challenged Blue Cross practices. This likelihood, while it cannot be quantified, cannot be ignored.

**Second Consideration: Objections**

A handful of objections – to which class counsel has responded in a separate memorandum – were received. *Only one objection – the "Flynn Objection" – addressed the*

*subject of fees*, alleging flatly that the fee was "outrageous."[15] It is difficult to tell from Mr. Flynn's letter whether the objection to the size of the fee is a "stand alone" objection or whether it is tied to his specific complaint that there were typographical errors in the published notice that appeared in the *Providence Journal*, for which class counsel (in Mr. Flynn's opinion) should be penalized.

Since full notice was mailed to 216,000 class members, and published notice appeared in every daily and weekly newspaper in Rhode Island, *the fact that there is but a single objection to the requested fee only highlights the tacit approval of hundreds of thousands of non-objectors*. Indeed, the Third Circuit interpreted the fact that only two of more than 300,000 class members objected to the fee award in a case before it could be interpreted as an endorsement of the trial court finding that "it would be hard to equal the skill class counsel demonstrated here."[16]

Moreover, Blue Cross itself offers no resistance to the proposed fee, a fact which – given the tumultuous nine-year history of this litigation – speaks silent volumes as to the fee's reasonableness under the circumstances.

**Third Consideration: The Skill and Efficiency of the Attorneys**

Excessive chest-beating is probably counterproductive and may be inappropriate in this context. While class counsel are justifiably proud of this settlement, both Courts have had more than ample opportunity to reach their own conclusions about "skill and efficiency." As the Courts know, class counsel successfully tried to conclusion a similar class action in this Court (Judge Torres) in November 2000, prevailing to the tune of 100% of all damages and interest

---

[15] The referenced objection is the Flynn objection, which is "Attachment A" to Plaintiffs' Memorandum in Response to Objections of Class Members. Mr. Flynn, in his letter, states that he finds the requested fee to be "an outrageous sum personally."

[16] In Re Rite Aid Corp. Securities Litigation, 396 F.3d 294, 298 (3rd Cir. 2005). (The court also noted its agreement with the trial court that "such a low level of objection is a "rare phenomenon.")

requested. The case that was tried before Judge Torres, however, was remarkably straightforward in terms of both fact and legal issues when compared to the present cases.

In any event, class counsel are highly experienced in complex litigation and difficult class actions, and have done their best to apply their experience to this case.

In terms of "efficiency," Mr. Wasylyk, whose clients originally brought him these cases, unsuccessfully approached regional attorneys with experience in class actions before turning to Minnesota counsel. Perhaps it was midwestern naivete more than anything else that led Minnesota counsel to sign on; presumably the more local attorneys, who were "closer to the ground," had at least some insight into the possible dimensions of what turned out to be a nine year odyssey. And while "tenacity" is not one of the criteria typically examined by courts in setting fees, it is a factor that played a larger part in this case than in most.

"Efficiency" as a positive factor is implicated by the very fact that the proposed settlement was achieved. The efficiency of the court system itself was materially advanced by the settlement. Consider:

- Full-blown mediation failed. Trial was imminent.
- The Courts had, at the time of the settlement, all but abandoned the possibility of a joint federal/state trial. Separate – and possibly bifurcated – trials would therefore have been necessary, with some issues being tried twice, raising difficult and perhaps novel issues of issue estoppel. The process of trials would have consumed more than a year.
- Blue Cross estimated felt that each trial would be many weeks in duration. It was certain to file interim and post-judgment appeals.
- The issues to be tried were exceedingly complex, rendered more so by changes in Blue Cross policy language throughout the 1990s, changes in Blue Cross methodology of claim processing, the large number of "products" at issue, and the plethora of alleged actionable practices.

Other efficiencies on the part of class counsel have had a direct impact on maximizing the amount of the settlement that will be available for distribution:

- Discovery revealed that class counsel's out-of-pocket costs for expert witness fees were a small fraction of comparable fees laid out by Blue Cross for defense experts.

- Class counsel subcontracted the personalized mailing of notice to a third party mailer. As a result, notice was sent at a small fraction of the cost normally extracted by professional settlement administrators for this service.[17]

- Class counsel has contracted for the preparation, mailing, and security of all checks at a cost of less than 90¢ per distributee, again a vast discount below "going rates" among professional class action settlement administrators.[18]

- The efficiencies in settlement administration directly result in additional dollars in the pockets of class members, since settlement administration expenses come from the fund itself.

**Fourth Consideration: The Complexity and Duration of the Litigation**

For the most part, complexity and duration considerations in these cases speak for themselves. Many of the points already addressed touch on these considerations, and the Courts need little further elaboration.

With the advantage of hindsight, class counsel can state with assurance that the presentation of the damage evidence in these cases would have been even more difficult and complex than class counsel believed it would be. There are a remarkably large number of "moving parts" in the damage calculations, and a surprisingly large number of claim scenarios that require special attention. The presentation of this evidence would have been extremely difficult and tedious at best.

And yet, under the Plan of Distribution, each class member entitled to payment receives an amount that is *precisely* derived from that person's personal claim history. Starting with a database of over 175 million claim histories, plaintiffs' expert, at extremely modest cost

[17] **Foster Aff., ¶¶ 9-11.**
[18] **Id.**

(relatively speaking), identified every claim that fit the description of the wrongdoing alleged in the case, then recalculated the claim based upon a methodology believed by class counsel to have been in compliance with the relevant subscriber contract language.

**Fifth Consideration: The Risks of Non-Recovery and Non-Payment**

The dedication of thousands of potentially unpaid hours and hundreds of thousands of "at risk" dollars to a venture fraught with as many pitfalls as this venture proved to encompass, constitutes a very real factor in evaluating the reasonableness of the proposed fee. By any standard, the risks undertaken by counsel were extremely high, *and the ultimate rewards were never clear*. As demonstrated below (sixth consideration), *the actual proposed return on this risk is nothing more than ordinary in the context of contingent fee results*. It is, given the risks, only fair that the fee award should produce a meaningful premium on the time and monies invested.

It may also be appropriate for the Courts to factor in the political risks that bore directly on this litigation. While the "value" of this risk cannot meaningfully be quantified, the political tenor in the United States changed dramatically between 1996, when the cases were filed and 2005, when they were settled. "Tort reform" came to be synonymous with "class action reform," resulting in extensive – and acrimonious – public debate as to the social value of class actions in both state and federal courts relative to their perceived abuse.

In this sociopolitical context, the risk of ultimate failure increased. Potential jurors were bombarded throughout the 2004 presidential campaign with the rhetoric of "class action abuse," the avarice of "trial lawyers," and so on.

The social and political risks only strengthen class counsel's belief that they have *earned* an appropriate return on their time and cash investments. A fee award that treats this matter as

though it were merely another piece of hourly work in a law office would fail entirely to embrace either the realities or the social value of a contingent fee practice. As the Third Circuit has noted:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.[19]

Because of the financial risks taken by class counsel, and their willingness to work for nine years without compensation, a huge number of people will be reimbursed a total of more than $11 million. Given the complexity of the case and the fact that no one was individually damaged by more than a few thousand dollars (and most by much less than that), few (if any) Blue Cross subscribers would – or could – have challenged these practices individually.

At the same time, class counsel ask the Courts to take judicial notice of the fact that contingent fees of 33 1/3% are commonplace in individual litigation, both commercial and personal (e.g., personal injury, product liability, fraud, etc.). It is not inappropriate to suggest that an average Blue Cross subscriber, if told that a lawyer would be willing to try to recover $300 that should not have been collected from the subscriber by Blue Cross, would gladly agree to representation on the basis that the attorney would keep one-third of anything actually recovered. A series of such transactions, viewed one-by-one, would draw no unusual attention whatsoever; it would seem perfectly normal.

In the class action context, however, it is not the individuals, but the Courts, that determine the reasonableness of the fee. Surely it is not a stretch to suggest that what would seem normal to an individual class member should seem normal to the Courts.

---

[19] Lindee Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 168 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976).

**Sixth Consideration: The Amount of Time Reasonably Devoted to the Case by Counsel**

In a "percentage-of-the-fund" recovery, the sixth consideration involves comparison of the respective results of a percentage approach and a lodestar approach. In *In Re Rite Aid*, the Third Circuit explained that:

> The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case."[20]

As established in the accompanying affidavit, the lodestar value of time applied by class counsel is $3.223 million.[21] This represents hours spent multiplied by the current hourly rates charged by each attorney for complex litigation matters. In summary, a total of 10,391 hours were expended by the three law firms that comprise class counsel, divided as follows:

| | |
|---|---|
| Siegel Brill Firm | 5,536 hours |
| Peter N. Wasylyk, Esq. | 4,012 hours |
| DeLuca & Weizenbaum | 843 hours |
| **Totals** | **10,391 hours**[22] |

The hourly rates attributed to the attorneys doing the vast bulk of the work in these firms[23] are as follows:

| | |
|---|---|
| Wood Foster | $425 |
| Jordan Lewis | $350 |
| Peter Wasylyk | $275 |
| Amato DeLuca | $400 |
| Miriam Weizenbaum | $350 |

---

[20] *In Re Rite Aid*, 396 F.3d at 306. A recent California decision notes that "a lodestar cross-check of this type is now in common use in district courts elsewhere in the country," citing one of the many *Cendant* opinions and noting that the method is endorsed by the MANUAL FOR COMPLEX LITIGATION FOURTH. In Re HPL Technologies, Inc. Sec. Litig., C-02-3510 (VRW) (N.D. Ca. 2005).

[21] **Foster Aff., ¶6.**

[22] This table shows hours to date only; the final lodestar values include a small segment of anticipated future time. See **Foster Aff., ¶¶3-5.**

[23] Other lawyers and legal assistants are billed at varying rates, but their time contributions as a percentage of the whole are entirely negligible.

| | |
|---|---|
| Michael T. Eskey | $300 |
| Ann Watson (Legal Assistant with law degree) | $120 |

The hours of each firm, multiplied by the specific hourly rates of the lawyers to whom each hour of work is attributable, results in a lodestar value of the work done on this case over the course of nine years of $3.223 million.[24] This breaks down as follows:

| | |
|---|---|
| Siegel, Brill Firm: | $1.765 million |
| Peter Wasylyk, Esq. | 1.128 million |
| DeLuca Firm: | .330 million |
| Total Lodestar: | $3.223 million |

In lodestar analysis, when and where it was/is in use, Courts routinely apply a "multiplier" to the lodestar amount, depending on the outcome, the risk involved, and many other factors. The factors most commonly used by courts to set a multiplier are – not surprisingly – very similar to the considerations used in setting a percentage fee. They include quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, the risk of non-payment, and any delay in payment.[25]

Thus, the calculated lodestar ($3.223 million) represents 56.84% of the requested percentage fee award ($5,670,000). This percentage is easily converted to a "multiplier," which is the number by which the lodestar amount must be multiplied in order to achieve the proposed fee award. In this case, that multiplier is 1.76 (because 1.76 multiplied by $3.223 million equals $5.67 million).

Accordingly, the question before the Courts is whether a multiplier of 1.76 falls within the range of acceptability in lodestar analysis.

---

[24] It is customary in lodestar calculations for work done over the course of many years to calculate the lodestar on the basis of current hourly rates. This method reflects the "time value" of money, since the hours expended in earlier years are not compounded by interest.

[25] Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION FOURTH, §14.122, pp. 193-196.

Quite simply, it does, *and it falls at the very low end of the scale.*

The seminal Third Circuit *Cendant Prides* opinion – frequently cited on this point – states broadly that "[multipliers] ranging from 1 to 4 are frequently applied in common fund cases when the lodestar method is applied."[26]

The 2003 Class Action Reporter survey found that the average lodestar multiplier was 4.5 for percentage-of-recovery fee awards in "mega fund" cases.[27] A Ninth Circuit survey of lodestar multipliers studied a range of awards involving multipliers of .06 to 8.5.[28]

Multipliers greatly exceeding the 1.76 requested in this case are legion.[29] Class counsel respectfully suggest that the very low multiplier in this case is the "clincher" as to the requested percentage of the settlement fund.

**Seventh Consideration: Awards in Similar Cases**

Class counsel's request in this case for a fee award of 33 1/3% is in line with awards throughout the United States. Consider:

- In an earlier proceeding in the prolonged *Rite Aid* litigation, Pennsylvania district court judge Dalzell described an affidavit presented by Professor John Coffee, a frequent commentator on class actions and attorneys' fees, that reported on Professor Coffee' his survey of 289 fee awards in class actions between $1

---

[26] In Re Cendant Corp. Prides Litig., 243 F.3d 722, 742 (3rd Cir. 2001).

[27] *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 170.

[28] Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050-51 (9th Cir. 2002).

[29] See, e.g., Nichols v. SmithKline Beecham Corp. Civ. 00-6222 (E.D. Pa. 2005) (multiplier of 3.15); Oh v. AT&T Corporation, Civ 99-2161 (D. N. J. 2005) (multiplier of 2.15); Wal-Mart Stores, Inv. v. Visa USA, Inc., 396 F.3d 96 (2nd Cir. 2005) (multiplier of 3.5); In Re Global Cross Securities, 225 F.RD. 436 (S.D.N.Y. 2004) (multiplier of 2.16); In Re Interpublic Securities Litigation, 02 Civ. 6527 (DLC) (class action) (S.D.N.Y. 2004) (multiplier for lead counsel of 3.96); In Re Linerboard Antitrust Litig., Civil Action Numbers 98-5055 and 99-1341, MDL No. 1261 (E.D. Pa. June 2, 2004) (multiplier of 3.67); In Re Visa Check/Matermoney Antitrust Litig., 297 F. Supp.2d 503 (E.D.N.Y. 2003) (multiplier 3.5); In Re Buspirone Antitrust Litig., No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (multiplier of 8.46); In Re In Re Aetna, 2001 Westlaw 20928 at *15 (multiplier of 3.6); Roberts v. Texaco, Inc., 979 F. Supp. 185, 198 (S.D.N.Y. 1995) (multiplier of 5.5); Weiss v. Mercedes-Benz of N. Am., 899 F. Supp. 1297, 1304 (D. N. J. 1995) (multiplier of 9.3); In Re RJR Nabisco Sec. Litig., MDL No. 818 (MBM), 1992 U.S. Dist. LEXIS 12702, at *16 (S.D.N.Y. August 24, 1992) (multiplier of 6); Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y. 1991) (multiplier of 8.75); Muchnick v. First Fed. Sav. & Loan Assoc., Civ. 86-1104, 1986 U.S. Dist. LEXIS, 19798 (E.D. Pa., September 30, 1986) (multiplier of 8);

million and $50 million. *According to this survey, the median fee percentage award was 33 1/3% and the average percentage award was 31.71%.*[30]

- The District Court judge in the *Unisys* litigation cited a number of cases showing that a 30% fee award is at *or below* the norm in percentage fee awards.[31]

- The *Unisys* court also noted that the fee petition submitted by class counsel in that case contained an appendix listing 37 cases in which the award of fees equaled or exceeded 33% of the fund.[32]

- "Judge Posner, in a 1998 Seventh Circuit opinion, affirmed an award amounting to 38% of the recovery in a class action, starting from what he considered to be a 25% 'benchmark figure.'"[33]

- "A 1996 study by National Economic Research Associates reviewed data from 433 shareholder class actions and calculated the average fee at 32% of the settlement."[34]

- "[T]hroughout the Sixth Circuit, attorneys' fees in class actions have ranged from 20%-50%."[35]

---

[30] In Re Rite Aid Corp. Sec. Litigation, 146 F. Supp.2d 706, 735-736 (E.D. Pa. 2001).

[31] Among the cases mentioned by the court: SmithKline Beckman Corp. Securities Litigation, 751 F. Supp. 525, 533 (E.D. Pa. 1990) (fee awards under percentage approach typically range from 19% to 45% of settlement fund); In Re TSO Financial Litigation, 1989 Westlaw 80316 at *6 (E.D. Pa. July 17, 1989) (awards in other common fund cases range between 19% and 45% of fund); In Re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1985) ("traditionally, courts in this circuit and elsewhere have awarded fees in the 20% to 50% range in class actions"), *aff'd*, 798 F.2d 35 (3rd Cir. 1986); In Re Activision Securities Litigation, 723 F. Supp. 1373, 1377 ("absent extraordinary circumstances ... the rate should be set at 30%").

[32] *Unisys*, 886 F. Supp. at 462.

[33] Gaskill v. Gordon, 160 F.3d 361, 362 (7th Cir. 1998).

[34] Martin, et al., RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS? at 12-13 (NERA 1996).

[35] Manners v. American General Life Ins. Co., 1999 Westlaw 33581944 at *29 (M.D. Tenn. August, 11, 1999).

- Awards of one-third or more are common.[36]
- "Our study of opinions of the Court of Appeals for the Tenth Circuit reveals that fees ranging from 15% to 50% of substantial recoveries have been affirmed."[37]

**B. Reimbursement of Costs Advanced by Class Counsel is Appropriate**

Reimbursement of expenses advanced in support of class litigation appears to be a routine element of virtually every fee award. Class counsel believed that nothing controversial is presented for decision with respect to the cost reimbursement aspects of this application.

As elsewhere noted, class counsel have literally "invested" over $421,306 in direct payments that were necessary in order to allow the litigation to proceed. The following chart,

---

[36] Because most fee awards are unreported, class counsel have marshaled information on fees primarily from two states, Minnesota and Pennsylvania. Class counsel have no reason to believe these states are not generally representative, but do not have access to unreported fee awards in most states. **Pennsylvania cases** include: Corel Corporation, Inc. Securities Litigation, 293 F. Supp.2d 484, 495-97 (E.D. Pa. 2003) (Brody, J.) (approving 33 1/3% award from $7 million settlement); In Re Unisys Corp. Securities Litigation, 2001 WL 1563721 at *3 (E.D. Pa. December 6, 2001 (Newcomer, J.) (approving 33% award from settlement of $5.75 million); In Re General Instruement Sec. Litigation, 209 F. Supp.2d 423, 433-34 (E.D. Pa. 2001 (Reed, J.) (approving 33 1/3% award from settlement of $48 million); In Re Tel-Save Sec. Litigation, No. 98-3145 (E.D. Pa. November 9, 2001) (Buckwalter, J.) (approving 33 1/3% award in settlement of $5.75 million); Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 147, 150 (E.D. Pa. 2000) (Brody, J.) (approving 33 1/3% award in settlement of $7.2 million); Neuberger v. Shapiro, 110 F. Supp.2d 373, 386 (E.D. Pa. 2000) (Ludwig, J.) (approving 33 1/3% award in settlement of $4.3 million); In Re Neoware Systems, Inc. Sec. Litigation, 2000 WL 1100871 *3-4 (E.D. Pa. July 27, 2000) (Kauffman, J.) (approving 33 1/3% award in settlement of $1 million); Blackman v. O'Brien Environmental Energy, Inc., 1999 WL 397389 (E.D. Pa. May 12, 1999) (O'Neil, J.) (awarding 35% of $875,000 settlement fund); Greenwich Pharm. Sec. Litig., 1995 U.S. Dist. LEXIS 5717, *16-17 (E.D. Pa. April 26, 1995) (fee award of 33.3% of $4.375 million cash settlement fund). **Minnesota fee awards** of one-third or more include: In Re Employee Benefit Plans Sec. Litig., No. 3-92-708, 1993 WL 330393 (D. Minn. June 2, 1993) (33 1/3% of the $4.2 million cash payment and 33 1/3% of the $6.5 million debentures to be issued); In Re Control Data Sec. Litig., No. 3-85-1341 (D. Minn. Sept. 23, 1994) (36.96% of $8 million fund); First Presbyterian Church v. John G. Kinnard & Co., No. 3-94-1024 (D. Minn. Dec. 12, 1995) (33 1/3% of the settlement amount); Gordan v. Am. Adjustable Rate Term Trust, No. 4-95-666 (D. Minn. Sept. 3, 1996) (33 1/3% of $15.8 million settlement); In Re LaserMaster Tech., Inc. Sec. Litig., No. 4-95-CV-631 (D. Minn. Oct. 9, 1997) (33 1/3%); In Re Airline Ticket Comm'n Antitrust Litig., 953 F. Supp. 280, 285-86 (D. Minn. 1997) (33 1/3% of$86 million fund); KK Motors v. Brunswick Corp., No. 98-2307 (D. Minn. Mar. 6, 2000) (33 1/3% of $30 million settlement); In Re Monosodium Glutamate Antitrust Litig., No. MDL 00-1328, 2003 WL 297275 (D. Minn. Feb. 6, 2003 (30% in attorney fees from $81.4 million settlement); In Re Select Comfort Corp. Sec. Litig., No. 99-884 (D. Minn. Feb. 28, 2003) (33 1/3% of $5,750,000 settlement); In Re E. W. Blanch Holdings, Inc. Sec. Litig., No. 01-248 (D. Minn. June 16, 2003) (33 1/3% of a $20 million settlement); Cooper v. Miller Johnson Steichen Kinnard, Inc., No. 02-CV-1236 (D. Minn. July 22, 2003) (25% of $5.65 million settlement); In Re U.S. Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir. 2002) (36% of $3.5 million settlement).

[37] Oppenlander v. Standard Oil Co. (Indiana), 64 F.R.D. 597, 616 (D. Co. 1974).

taken directly from the supporting affidavit, accurately describes the areas in which costs were incurred, and identifies the areas requiring the greatest outlays.

While some of the expenses reflected in the table are post-settlement, it is important to note that some of the larger post settlement costs have been paid directly from the settlement fund.[38] However, none of the costs identified in the table below have been reimbursed to counsel at this point in time from any source.

| | **Siegel Brill Law Firm** | **DeLuca & Weizenbaum** | **Peter N. Wasylyk** | **Total** |
|---|---|---|---|---|
| Internal copy and fax | $28,037 | $600 | $11,590 | $40,227 |
| External printing, copying, binding | 9,466 | 6,128 | 0 | 15,594 |
| Long distance telephone | 536 | 46 | 8,959 | 9,541 |
| Messenger/courier/ overnight | 3,928 | 1,753 | 1,428 | 7,109 |
| Electronic research | 10,534 | 184 | 2,173 | 12,891 |
| Expert witness fees and data conversion | 238,978 | 0 | 0 | 238,978 |
| Mediation fees | 6,277 | 0 | 0 | 6,277 |
| Travel, lodging and parking | 63,481 | 75 | 2,367 | 65,923 |
| Filing and related fees | 116 | 1,543 | 0 | 1,659 |
| Deposition expense (not including travel) | 9,325 | 5,112 | 0 | 14,437 |
| Miscellaneous | 7,821 | 849 | 0 | 8,670 |
| **Total** | $378,499 | $16,290 | $26,517 | **$421,306** |

Except as it may have been negotiated otherwise, awards to counsel typically involve *both* a "fee" component and a "costs" component. In the experience of class counsel, which is reasonably extensive, separate fee and cost awards are always made. In this case, the fee has been computed on $17 million (rather than the total settlement amount of $17.5 million plus interest accrued since spring 2005). The ultimate total of all costs expected to be incurred in this case comes to approximately $651,599,[39] made up of the following components:

| | |
|---|---|
| Present application for costs: | $421,306 |
| Costs expended to date from settlement fund | $88,293 |
| Anticipated future settlement administration costs | $148,000 |
| **Total** | **$651,599** |

[38] Foster Aff., ¶9.

[39] **Foster Aff., ¶¶9-10.**

By omitting $500,000 of the corpus of the settlement fund and omitting roughly $200,000 of interest on the settlement fund from their fee calculation, class counsel have avoided any possible concern that the fee requested overlaps the costs in any way.

**C. Class Representative Awards Are Appropriate in this Case**

Paul and Margie Caranci, Kerrigan Hanoian, Dariusz Dziadkiewicz, Terrence Kane and the other plaintiffs (present and past), approached Providence attorney Peter Wasylyk in 1995 and 1996 to discuss what they perceived to be serious discrepancies in the way they were treated on various types of Rhode Island Blue Cross claims. Ultimately, after lengthy consultations and extensive research by Mr. Wasylyk, as well as a difficult search for co-counsel, eight people agreed to serve as class representative plaintiffs in the two cases that now culminate in a $17.5 million settlement. Five of them remain plaintiffs: Dariusz Dziadkiewicz, Carl Durden, Kerrigan Hanoian, Terrence Kane, and Joseph Triangolo.

Along the way, the class representatives were subjected to document productions, depositions, and numerous meetings with counsel. They have stayed abreast of the cases from the outset, and performed a valuable service, both to class members and to the public as a whole.

Paul and Margie Caranci, Roseanne Ehrenberg and Karen Tancredi, all of whom were plaintiffs at one stage or another, fell by the wayside as one or another court ruling eliminated them from further service. In the end, however, the claims asserted by each of these persons were vindicated, and are very much a part of the ultimate settlement.

Class representative awards have long been recognized as an appropriate incentive for persons to step into the sometimes harsh limelight as class representative plaintiffs in cases that are almost invariably hard-fought. In this case, class counsel, on behalf of the class representative plaintiffs, ask the Courts to award $25,000 each to the five remaining named

plaintiffs, and $10,000 each to the Carancis (single award), Ms. Ehrenberg and Ms. Tancredi. These requested awards are in line with amounts awarded in many cases, though class counsel cannot point to cases that make awards to plaintiffs who fell by the wayside for technical reasons.

If the requested awards are granted in their entirety, the total award would be $155,000. If this amount is thought of as coming directly out of the portion of the settlement otherwise distributable to class members (approximately $11.3 million), the average individual distribution amount would be reduced by 1.37%, or $1.27 off of the distributive share of a class member having the average $93 distribution amount, and 25¢ off the share of a class member otherwise receiving a $20 distribution.

Class counsel can point to a number of cases in which they have personally been involved in which motions for class representative awards of this magnitude were granted. Each listed case involved a total settlement considerably smaller than the present settlement. They include:

- Anderson, et al v. Blue Cross Blue Shield of Minnesota[40] and related cases (total award to lead plaintiff Elizabeth Tucker exceeded $30,000);
- A healthcare class action in Massachusetts, which resulted in a $50,000 class representative award to a non-profit corporation;[41]
- A health-related case against Medica Insurance Company in Minnesota, in which an award of $25,000 was made;[42]

---

40 Elizabeth Tucker, et al. v. BCBSM, Inc., Case No. CT 94-015477, Hennepin County District Court, Minneapolis, Minnesota (1994); Erik S. Anderson, et al. v. BCBSM, Inc., Case No. 3-94-1139 (D. Minn. 1994); Elizabeth Tucker, et al. v. BCBSM, Inc. and Minnesota Comprehensive Health Association, Case No. CT 94-015477, Hennepin County District Court, Minneapolis, Minnesota (1994).

41 HealthCare for All v. Blue Cross Blue Shield of Massachusetts, Inc., Court File No. 95-12475 RCL (D. C. Mass. 2000)

42 Carol DeVries v. Allina Health Systems, et al. Court File No. 95-008953, Hennepin County District court, Minneapolis, Minnesota (1995).

- Antitrust litigation in Alabama, resulting in three class representative awards of $33,000 each;[43]

- Judge Torres of the Rhode Island District Court and Judge Silverstein each approved class representative awards of $20,000 to class representatives in health-related class actions against United Health Care of New England in the wake of a 2001 settlement of post-trial settlement of those cases.[44] (It should be noted that the total settlement amount was approximately 25% of the settlement amount before the Courts in the present case.)

Many courts have made class representative awards of $25,000 and higher. A federal court in Louisiana recently awarded $102,000 to class representatives in a case in which the amount allocable to class members was $3.6 million.[45] The court in the *Linerboard* cited earlier in this memorandum, awarded $25,000 to each of five class representatives.[46] An award in the same amount was granted to a class representative in a recent Illinois federal case.[47]

Many other cases have come to the same result, though it is certainly correct to say that in many situations, courts have awarded less than this amount (often because less was requested).[48]

---

43 Four Way Plant Farm v. Alabama Workers Compensation, Court File No. CV-94-82.80 (D. Ala. 1999).

44 Linda A. Corsini, et al. v. United HealthCare Services, Inc., et al., Court file No. CA96-0608T (D.R.I. 1996); Elizabeth A. St. Germain v. United Health Plans of New England, Inc., Court File No. 96-5884, Providence Superior Court (1996).

45 Camp v. Progressive Corp., Civ. 01-2680 (E.D. La. 2004), p. 16.

46 In Re Linerboard Antitrust Litigation, 2004 WL 1221350 at *18-19 (E.D. Pa. June 2, 2004). In this case, Judge DuBois reviewed the case law and pointed to the "ample authority" for such an award, citing Tenuto v. Transworld Systems, Inc., No. A99-4228, 2002 WL 188569 (E.D. Pa. Jan. 31, 2002); In Re Residential Doors Antitrust Litig., Nos. 93-3744, 96-2125, 1998 WL 151804, *8 (E.D. Pa. Apr. 2, 1998); Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1999); In Re Lease Oil Antitrust Litig., 186 F.R.D. 402 (S.D. Tex. 1999); and In Re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 357 (N.D. Ga. 1993).

47 Morlan v. Universal Guarantee Life Ins. Co., Civ. 99-274-GPM (S.D. Ill. 2003).

48 *See, e.g.*, In Re Graphite Electrodes Antitrust Litigation, MDL No. 1244 (E.D. Pa., 9/8/03) ($80,000 award); In Re Busiprone Antitrust Litigation, MDL No. 1413 (S.D.N.Y. 4/7/03) ($25,000 award); Brotherton v. Cleavland, 141 F. Supp.2d 907 (S.D. Ohio 2001) ($50,000 award); Selzer v. Board of Education, 1993 Westlaw 42787 at *4 (S.D.N.Y. 1993) ($47,000 awards to each of two class representatives); Sheppard v. Consolidated Edison Co. of New York, Inc., 94-CV-0403 (JG) (E.D.N.Y. 2002) (two of six class representatives awarded $25,000 or more); Roberts v. Texaco, 979 F. Supp. 185, 205 (S.D.N.Y. 1997) (recommending incentive awards of $2,500, $25,000, $50,000 and $85,000); Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 251 (S.D. Ohio 1991) ($50,000 incentive awards); In Re Dunn & Bradstreet Credit Serv. Customer Litigation, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (awards from $35,000 to $55,000); In Re Revco Securities Litigation, 1992 Westlaw 118800 (N.D. Ohio 5/6/92) ($90,000 award); First Jersey Securities, Inc., MDL No. 681 (E.D. Pa. 1989) ($24,000); Bogosian v. Gulf Oil Corp., 621 F. Supp. 27 (E.D. Pa. 1985) ($20,000); and In Re Cardizem CD Antitrust Litigation, MDL No. 1278 (S.D. Mich., Nov. 26, 2002).

In *Linerboard*, Judge DuBois concluded that special payments to class representatives were firmly rooted in notions of the equitable obligations of the other class members:

> Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly. *In Re Plastic Tableware Antitrust Litigation*, No. 94-CV-3564, 2000 WL 188569 (E.D. Pa. Dec. 4, 1998) ("payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court ... they may also be treated as a reward for public service and for the conferring of a benefit on the entire class").[49]

Judge DuBois also referenced Cohen v. Whitman Medical Corp., 197 F.R.D. 1236 (E.D. Pa. 2000) ("[c]ourts routinely approve incentive awards for the services they provide and the risks they incurred during the course of the class action litigation").

It is no exaggeration to say that the distributions soon to be made to over 100,000 Rhode Islanders stem entirely from the initiative taken by the eight present and former plaintiffs in these cases. Class counsel strongly believe it would be a significant injustice not to reward their initiative, their effort, and their perseverance by the award of the requested amounts. Their cases were prosecuted in the best tradition of class actions, and the recovery ranks as one of the highest in Rhode Island state history.

---

[49] *Linerboard*, *supra* at *18.

## Conclusion

Plaintiffs respectfully request that the Courts grant the requested fees, costs and class representative awards.

Dated: July 1, 2005.

Respectfully submitted,

By: ______________________

Wood R. Foster, Jr.
Jordan M. Lewis
**SIEGEL, BRILL, GREUPNER & DUFFY, P.A.**
1300 Washington Square
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-7131
(612) 339-6591 fax

By: ______________________

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
**DeLUCA & WEIZENBAUM, LTD.**
36 Exchange Terrace
Providence, RI 02903
(401) 453-1500
(401) 453-1501 fax

Peter N. Wasylyk (# 3351)
**Law Offices of Peter N. Wasylyk**
1307 Chalkstone Avenue
Providence, RI 02908
(401) 831-7730
(401) 861-6064 fax

**ATTORNEYS FOR PLAINTIFFS**

37-HSF-7/1/05-20370\002