LAW OFFICES

SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.

1300 WASHINGTON SQUARE
100 WASHINGTON AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55401
TELEPHONE (612) 337-6100
FACSIMILE (612) 339-6591
E-MAIL ADDRESS: woodfoster@SBGDF.com

JOSIAH E. BRILL, JR.
JAMES R. GREUPNER
GERALD S. DUFFY
WOOD R. FOSTER, JR.
THOMAS H. GOODMAN
JOHN S. WATSON
WM. CHRISTOPHER PENWELL
ANTHONY J. GLEEKEL
SHERRI L. ROHLF
JORDAN M. LEWIS*
BRIAN E. WEISBERG
STEVEN J. WEINTRAUT
M. GREGORY SIMPSON
JAMES A. YAROSH

MICHAEL J. VIOLA
JERRIE M. HAYES
MARK THIEROFF
BREANNA L. YOUNG

*1845 WALNUT STREET
24TH FLOOR
PHILADELPHIA, PA 19103
(215) 814-9322
FAX (215) 814-9323

October 5, 2005

20370-FL-003

***VIA FACSIMILE***

The Honorable William E. Smith
U. S. District Court
District of Rhode Island
One Exchange Terrace
Providence, RI 02903

Ms. Melissa Darigan
Partridge, Snow & Hahn
180 South Main Street
Providence, RI 02903-7120

The Honorable Michael A. Silverstein
Associate Justice
Providence County Superior Court
250 Benefit Street
Providence, RI 02903

Re: **Administration of Blue Cross Class Action Settlement**

Dear Judges Smith and Silverstein and Ms. Darigan:

A recent email to me from Melissa Darigan indicates that some serious concerns have been raised at numerous levels regarding the distribution of settlement funds. The purpose of this letter is to explain to you some of the problems we are encountering, and to assure you that all possible and appropriate steps are being taken to be sure that the correct amounts end up in the right hands.

Let me begin by reminding you of some of the numbers involved here, as these numbers give a useful perspective on what has happened.

- Overall class size is approximately 296,000 (adjusted damages of one cent or more).
- Approximately 216,000 class members received direct mailed notice. Of these,
  - 116,000 were told that they would receive money, and given information as to approximately how much;
  - 100,000 were told they were class members, but that they would *not* receive a check.

EXHIBIT A

- Additional notice appeared in virtually every Rhode Island newspaper.

- Of the 116,000 who were scheduled to receive checks, approximately half qualified for the second distribution.

While the 216,000 notices went out by bulk mail, we paid a slightly higher rate than basic bulk rates in order to do two things:

- All addresses for people who were scheduled to receive a check were run through the "National Change of Address" (NCOA) database, which gave us approximately 8,800 new addresses out of 116,000.

- We used a rate that was intended to give us an idea as to how many addresses were still "bad," because it included the return of undeliverable notices.

The combination of nearly 9,000 new addresses and the fact that literally a handful (less than 100) notices were returned gave us the false impression that we had good addresses for the 116,000 people who were scheduled to receive checks. Our arrangements for administration of the settlement were premised on the belief that we would not see many returns.

In reality, this could not have been more wrong. The checks, of course, were mailed at a higher postal level, one that apparently "really does" result in our getting mail back. So far, *over 15,000* checks have been returned as undeliverable.

Moreover, this settlement was apparently the subject of a good deal of newspaper coverage in Providence – publicity that gave many people the impression that virtually everyone who ever had Blue Cross coverage was going to get a check. And, of course, many people have seen relatives, co-workers, and friends receive checks, and have therefore assumed that they, too, should be receiving one. This impression ignited a veritable "Katrina" of telephone calls.

In retrospect, it was probably a mistake for Mr. Wasylyk's name and telephone number to have been included in the cover letter for the check; somehow, as well, his telephone number appeared in a *Providence Journal* article. As a result, Mr. Wasylyk – a sole practitioner – has received literally thousands of telephone calls, swamping his voicemail and his very small part-time staff. They have listened to tape after tape of voicemail messages, and have provided names and telephone numbers to my office of at least 1,000 people needing return calls, with which we are current. We can field all calls and either answer them or call back quickly. But Mr. Wasylyk still has dozens of tapes to listen to and transcribe numbers from.

The vast bulk of telephone calls are from people wanting to know why they did not receive a check – a question that is harder to answer than one might suppose, given the possibility that the caller might be among the 15,000 whose checks have been returned. But, as described below, there are many other reasons for the calls, each requiring a variety of actions. Our callers have access to the lists of entitled recipients, but the process is obviously time-consuming.

I will devote the remainder of this letter to explaining what we are doing with respect to the various fact scenarios we have encountered so far.

**1. Returned Mail**

So far, about 15,000 checks have been returned. All have been shipped to my office.

Of these, about 2,300 had "forwarding period expired" stickers, which also included a new address for the recipient. At this time, *all* of these 2,300 have been remailed in a new envelope bearing the address shown on the post office forwarding sticker. A few have been returned, but most appear to be reaching their marks.

The remaining 13,000 (a small number are still coming in) have been submitted to a vendor who will again run them through various address and deceased persons databases. This is possible because several members of my staff have spent hundreds of hours checking each envelope off against the two databases that resulted in the original mailing (one for people entitled to a second check, the other for people entitled to only one check). The expected turnaround on this new address screen is short, and we will begin remailing returned checks next week. Given the age of some of the class members' claims, we anticipate that a significant number of class members are deceased or that the address provided to us from the Blue Cross database is so old that it will be impossible to obtain a current address. Our vendor has informed us that in a mailing of this kind, it would not be unusual to have 10% of the total original mailings to remain undeliverable.

At the moment, all first round checks must be cashed by November 1, on which date all checks will become void. It is within our discretion to "push" that date as necessary, depending on when the remailing of first round checks is complete. Each remailed check will be accompanied by a high profile notice stating that the check must be cashed by November 1.

Any checks that do not reach their mark in this remailing will be voided on November 1 (or later, if necessary), and will become part of the fund that pays for the second distribution.

**2. Deceased Class Members**

Many of the returned checks bear the notation "deceased" on the envelope. We do not intend to take further action with respect to those checks, and that money will become part of the second distribution fund.

However, in many, many cases, when a deceased class member's check has gone to a family member, the family member has called and/or written asking for a new check made out to them. We had hoped that Rhode Island banks would be somewhat generous in allowing a spouse, for example, to cash a check payable to her deceased husband. We hoped wrong. The banks have been quite strict about this, despite assurances by telephone to me personally (in some cases) that they were going to allow these checks to be deposited.

Our position on reissuing checks at this point is that we will reissue to the person seeking reissuance if they give us a letter explaining the relationship and a copy of the death certificate, *along with the uncashed check.*

At this point, we have hundreds of these "reissue" situations, and are in frequent contact with the people who don't seem to be able to get a death certificate, etc. I anticipate that several hundred checks will be reissued by hand in connection with this group.

**3. Ruined Checks**

A surprising number of checks were delivered to recipients in shreds, or otherwise torn in a way that prevents a bank from accepting it.

When a recipient receives a shredded check (or accidentally ruins it himself in the opening process), we will reissue manually, *but only after the recipient returns the original check.* It is possible that a little "fol-de-rol" can occur in these instances, and we are being careful.

Some people say the check was accidentally thrown out, lost, or eaten by the dog, and we are loath to reissue until we can check with the bank to be sure that the original has not been cashed. This, needless to say, is a time consuming process, but we will deal with every such instance.

**4. Special Situations**

In addition to the foregoing, which encompasses 99.9% of all checks at issue, there are many special situations that must be dealt with one-by-one. One example:

- One couple has not received their checks (they were each entitled to a check), and have been calling regularly (and angrily) to find out where their checks are. We have determined that the address used in our mailing was the correct address, and the checks have not been returned. We will ultimately have to fashion a solution, and that solution will include checking with the bank to be sure the original checks have not been cashed.

In the meantime, a huge percentage of the telephone calls we get (which may ultimately reach 10,000) are from people who are not – and never were – entitled to receive a check. And despite Rhode Island's well-deserved reputation as the home of many friendly, understanding citizens, these callers tend to be persistent, angry and even desperate. We know they have been calling city officials, state officials, the Courts, Blue Cross and Ms. Darigan. I have a total of seven people working on all of these issues, two of whom have each fielded at least 1,000 calls. Many callers call repeatedly.

**5. Claim Forms**

Finally, Ms. Darigan raised the issue of the address to which the Claim Forms should be returned. To my knowledge, there is no problem in this regard, as tens of thousands of claim forms have been returned to the correct post office box, and are being collected in Bud DeLuca's office. The procedure involved required people to address their own envelope to the Providence post office address, and invariably some of those persons have probably miscopied the address.

If the Courts have received claim forms, we would appreciate their being forwarded to Ms. Tina DeLaive at DeLuca & Weizenbaum, who is (for the moment, at least) the custodian of the claim forms.

So that's my tale of woe; I assure you that this whole process is front and center everyday (and has been for over a month) in my office and in Peter Wasylyk's office. It is the sheer magnitude of the problem that has led to frustration on the part of some citizens, many of whom misunderstand the settlement and believe they should be getting a check when in fact they should not.

I hope this letter alleviates concerns the Courts may have about our attention to this settlement; indeed, I am satisfied that things are going quite well under the circumstances, and we are being careful to give people individual attention as necessary. Millions of dollars worth of checks have been cashed by tens of thousands of class members. We hope to get every check into the right hands in a timely manner, and continue to believe we are on track to do so.

Very truly yours,

Wood R. Foster, Jr.

WRF/hsf

cc: Peter Wasylyk
Amato DeLuca
Jordan Lewis